**C.A. No. 17-71867**

D. Ct. Nos. 2:17-mj-09200-ESW-1; 2:17-cr-00803-DLR-1; and
2:15-cr-00280-SMM-1

## UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

———————

RODRIGO ZERMENO-GOMEZ; et al., Petitioners

v.

UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF ARIZONA, Respondent Court,

and

UNITED STATES OF AMERICA,
Real Party in Interest.

———————

## UNITED STATES' RESPONSE TO
## PETITION FOR WRIT OF MANDAMUS

———————

ELIZABETH A. STRANGE
Acting United States Attorney
District of Arizona

DOMINIC W. LANZA
KRISSA M. LANHAM
Assistant U.S. Attorneys
Two Renaissance Square
40 N. Central Avenue, Suite 1200
Phoenix, Arizona 85004-4408
Telephone: (602) 514-7500
Attorneys for Appellee

Date Submitted via ECF: July 21, 2017

# I.  <u>TABLE OF CONTENTS</u>

Page

I.      Table of Contents ............................................................................. i

II.     Table of Authorities ........................................................................ ii

III.    Introduction ...................................................................................... 1

IV.     Issues Presented ............................................................................... 2

V.      Facts and Prcedural History

    A.     The *Sanchez-Gomez* Decision ............................................ 3

    B.     Arizona's Shackling Procedures Before and After *Sanchez-Gomez* .... 3

    C.     Injunction ................................................................................ 13

VI.     Standard for Relief ........................................................................ 13

VII.    Argument ......................................................................................... 14

    A.     Petitioners Cannot Satisfy the First *Bauman* Factor. ......... 15

    B.     Petitioners Cannot Satisfy the Third *Bauman* Factor ......... 21

VIII.   Conclusion ...................................................................................... 30

IX.     Certificate of Service ..................................................................... 31

## II.  <u>TABLE OF AUTHORITIES</u>

<u>CASES</u>

*Bauman v. U.S. Dist. Ct.*, 557 F.2d 650 (9th Cir. 1977) ...................... 14-15, 21-23

*Bradford v. HSBC Mortgage Corp.*, 2012 WL 12875878
   (E.D. Va. 2012) ............................................................................. 24-25

*Burlington Northern & Santa Fe Ry. Co. v. U.S. Dist. Ct.,*
   *for Dist. Of Mont.*, 408 F.3d 1142 (9th Cir. 2005) ............................. 21

*Califano v. Moynahan*, 596 F.2d 1320 (6th Cir. 1979) ........................ 19

*Carver v. Lehman*, 558 F.3d 869 (9th Cir. 2009) ........................... 7, 10, 23, 25-27

*Chambers v. United States*, 22 F.3d 939 (9th Cir. 1994) .................................. 6, 25

*Cheney v. U.S. Dist. Ct. for D.C.*, 542 U.S. 367 (2004) .................................. 13, 21

*DeGeorge v. U.S. Dist. Ct. for C.D. Cal.*, 219 F.3d 930 (9th Cir. 2000) ............. 22

*Gonzalez v. Arizona*, 677 F.3d 383 (9th Cir. 2012) ............................................. 26

*In re Anonymous Online Speakers*, 661 F.3d 1168 *(*9th Cir. 2011*)* ..................... 14

*In re Van Dusen*, 654 F.3d 838 (9th Cir. 2011) ............................................. 22, 26

*McLeod v. Nagle*, 48 F.2d 189 (9th Cir. 1931) ................................................. 28

*Nat'l Resources Def. Council, Inc. v. County of Los Angeles*,
   725 F.3d 1194 (9th Cir. 2013) ........................................... 23-24, 25-28

*United States v. Foumai*, 910 F.2d 617 (9th Cir. 1990) ........................................ 10

*United States v. Gasca-Ruiz*, 852 F.3d 1167 (9th Cir. 2017) ............................... 27

*United States v. Gomez-Lopez*, 62 F.3d 304 (9th Cir. 1995) ..................... 6, 25, 27

*United States v. Hayes*, 555 U.S. 415 (2009) ...................................................... 28

*United States v. Mehrmanesh*, 652 F.3d 766, (9th Cir. 1981) .............................. 22

*United States v. Ruiz*, 935 F.2d 1033 (9th Cir. 1991) ......................... 10, 23, 25-27

*United States v. Sanchez-Gomez*, 859 F.3d 649 (9th Cir. 2017) ........... 3, 15, 20-21

*United States v. Swan*, 327 F. Supp. 2d 1068 (D. Neb. 2004) .............................. 25

*United States v. United States* Dist. Ct. for S.D. Cal.,
   384 F.3d 1202 *(*9th Cir. 2004*)* ......................................................... 19

*Wedbush, Noble, Cooke, Inc. v. SEC*, 714 F.2d 923 (9th Cir. 1983) .............. 25, 27

*Will v. United States*, 389 U.S. 90 (1967) ...................................................... 13, 15

**<u>RULES</u>**

Fed. R. App. P. 41(c) ........................................................... 24-25, 27-28

### III. __INTRODUCTION__

Faced with a Ninth Circuit opinion that fundamentally changed the concepts of dignity and security in their courtrooms, the 35 magistrate and district judges of the District of Arizona started to formulate a logical, fair, and consistent way to comply with the decision. Before they could complete that process, Petitioners sought a writ of district-wide mandamus, charging that many judges who had yet to even consider the issue—along with others who had considered the issue and rejected Petitioners' position in light of this Court's precedents, and still others who were applying the decision in a manner agreed-to by members of the Federal Public Defender's (FPD's) Office—were adhering to a routine shackling policy for clearly erroneous reasons. But Petitioners had other adequate means to attain the relief they desired, and the few judges who decided the issue were following this Court's authority suggesting that reliance on an unmandated opinion is a "gamble." The judges were not conducting indefensible analyses that lacked any support in the case law, nor were they usurping power or abusing their discretion. The request for mandamus must be denied.

1

# IV.  ISSUES PRESENTED

A.    Whether Petitioners have demonstrated that a mandamus petition directed toward 35 different judges is the only means to attain the relief they seek, where there is no district-wide policy concerning either shackling or the effect of the stay of the mandate, they failed to challenge magistrate judges' individual shackling determinations before the district court or give a majority of judges a chance to decide the effect of the stayed mandate, and they sought no other relief from the district court before filing for mandamus.

B.    Whether certain judges committed "clear error" by concluding that an opinion issued by this Court does not become binding Circuit law until the mandate has issued, where there appears to be an intra-Circuit split of authority on this issue and courts in other Circuits follow the same approach.

## V. <u>FACTS AND PROCEDURAL HISTORY</u>

### A.     <u>The *Sanchez-Gomez* Decision</u>

On May 31, 2017, this Court issued an *en banc* opinion holding that "[b]efore a presumptively innocent defendant may be shackled, the court must make an individualized decision that a compelling government purpose would be served and that shackles are the least restrictive means for maintaining security and order in the courtroom." *United States v. Sanchez-Gomez*, 859 F.3d 649, 661 (9th Cir. 2017). The procedural posture that led to the holding was unusual: the defendants had appeared in shackles at their initial hearings in front of magistrate judges, appealed the denials of their unshackling requests to the district court, filed "emergency motions" challenging the constitutionality of the Southern District of California's routine shackling policy, and then appealed those determinations. *Id.* at 654. The Court consolidated the defendants' appeals and construed them as a petition for a writ of mandamus, ultimately denying the petition because "[t]he policy that defendants challenged here isn't presently in effect." *Id*. at 654-55, 666.

The government filed a motion to stay the mandate, and on June 16, 2017, the Court issued an order staying the issuance of the mandate for ninety days.

### B.     <u>Arizona's Shackling Procedures Before and After *Sanchez-Gomez*</u>

Because the factual record has not been fully developed, it is not clear what policy the District of Arizona maintained for shackling in-custody defendants before

3

May 31, 2017, when the *en banc* decision in *Sanchez-Gomez* was issued. It is likely that the district court had a "general position . . . to have full restraints in all detained defendant cases." (Repl. App. D at 5.[1] *See also* Supp. App. at 7 ("We do have a policy in this district after consulting with the U.S. Marshal that shackling is the appropriate way to monitor defendants who are in custody, in court for various proceedings from beginning to end.").)[2]

It is also unclear what policy, if any, the District of Arizona maintained during the two-week period immediately after the *en banc* opinion in *Sanchez-Gomez* was issued. Petitioners state, without support, that "[i]mmediately after *Sanchez-Gomez* was issued, District of Arizona judges in some cases made individualized determinations as to whether defendants would be shackled in their courtrooms." (Pet. at 3.) The United States has no additional information to support or refute

---

[1] "Pet." refers to the Petition for a Writ of Mandamus, Dkt. 1-2, "Repl." refers to the Reply in Support of the Emergency Motion for an Injunction, Dkt. 7-1, and "Suppl." Refers to the Supplement to the Petition for Writ of Mandamus, Dkt. 10-1. "App." refers to the Appendices to each of these documents, followed by the page number.

[2] In 2015, after the initial panel opinion in *Sanchez-Gomez* was issued, the District Court formed an "ad hoc committee" to study the issue of shackling. The committee was headed by District Judge Tuchi and included members from the FPD's office and USAO. (Email to Counsel (Ex. A).) This committee "provided extensive research and analysis and crafted several recommendation options to the court" in 2016, contemplating "classes of restraint based on general criminal history categories and or hearing types at issue . . . ." (Email to Counsel (Ex. B).) However, the district court decided to take no action on the committee's recommendations pending the outcome of the *en banc* process. (Ex. B.)

Petitioners' assertion. During this time period, District Judge Snow indicated that "the district [was] . . . sort of grappling with [*Sanchez-Gomez*], what we're going to do about it, in light of the large number of defendants we see here and how we handle the individualized assessments, and we're going to try to do that in a logical and fair way." (Repl. App. B at 6.)

Finally, the record is again undeveloped with respect to the shackling procedures that have been followed in Arizona since the issuance of the order staying the mandate on June 16, 2017. As explained below, although the mandamus petition suggests that some uniform, District-wide policy was directed and implemented, the reality is that individual judges' practices have been mixed. For example:

1. <u>Magistrate Judge Boyle</u>: Judge Boyle was handling the criminal duty calendar the week of June 19, conducting the initial appearances and arraignments for the district court in Phoenix. During his first day on duty, Judge Boyle

> reviewed the pretrial services reports and made initial determinations regarding shackling. There were seven cases on the [initial appearance] calendar. [He] identified four individuals who would remain shackled absent further argument. For the three defendants subject to reduced/no shackling, [he] asked their counsel if those defendants wished to appear unshackled ([he] did this prior to the IA proceedings.) If so, [he] told counsel those cases would be called separately at the end of the calendar. Counsel elected unshackling in all three cases; their clients were taken out of the courtroom; [he] entered the courtroom and conducted IAs for the first four shackled defendants; and then called the three separate, unshackled cases.

5

(Ex. C; Pet. App. D at 1.) The following day, Judge Boyle convened a hearing—speaking only for himself and not "any other judge" (Ex. C)—on whether he was bound by *Sanchez-Gomez* in light of the stay of the mandate.

In response, the FPD's office and the USAO each filed memoranda addressing the effect of the stay of the mandate. (Pet. App. D; Ex. D.[3]) Judge Boyle held oral argument to try to determine "the precedential value of a case without a mandate." (RT 6/20/17 (Ex. E) at 4.) He emphasized that the hearing would "only be for" him, and "imagine[d] that attorneys are arguing these in random settings throughout the court during the weeks that we've had this case." (Ex. E at 2.) The FPD's office argued that Judge Boyle was "bound by the decision in *Sanchez-Gomez*" because "the Ninth Circuit has made clear through its own case law that a published decision of the Ninth Circuit is the law of the circuit, and it binds the lower courts, even when a mandate has not yet issued," citing *United States v. Gomez-Lopez*, 62 F.3d 304 (9th Cir. 1995), and *Chambers v. United States*, 22 F.3d 939 (9th Cir. 1994), *vacated on other grounds*, 47 F.3d 1015 (9th Cir. 1995). (Ex. E at 5, 7.) The government argued that "[t]he law in this area is not a model of clarity[,]" noting that the cases the FPD cited "do not support our position, but then . . . cases subsequent to them . . . seem to come out the polar opposite of them[,]" and "the later cases don't try to

---

[3] Before the hearing, the FPD's office filed "[a]n earlier version of [the] memorandum" appearing as Exhibit D. Following Judge Boyle's ruling, "portions [were] added" to the memorandum (Ex. D at 2-3); Exhibit D is the final filed version.

reconcile their logic with the earlier ones." (Ex. E at 12, 15-16 (discussing *Carver v. Lehman*, 558 F.3d 869 (9th Cir. 2009).) Because this was "a situation where you have published cases going both ways that don't overrule each other," the government argued the magistrate court had "some leeway to try to figure out, starting with first principles[,] what will make sense." (Ex. E at 13.)

Judge Boyle asked the FPD attorney to attempt to reconcile her office's position with the fact that the Ninth Circuit has not adopted any rules similar to the Eleventh Circuit, *see* 11th Cir. R. 36-2, Internal Operating Procedure 2 (11th Cir. Dec. 2016) ("Under the law of this circuit, published opinions are binding precedent. The issuance or non-issuance of the mandate does not affect this result."), and with the standard language contained within Ninth Circuit mandates ("The judgment of this Court entered X date takes effect this date."). (Ex. E at 10-12.) He then asked the USAO attorney to attempt to reconcile his office's position with the language in orders this Court typically issues when taking a case *en banc* ("The three-judge panel disposition in the case shall not be cited as precedent by or to any court of the Ninth Circuit."). (Ex. E at 17.) Judge Boyle was clearly grappling with the mandate question and sought the parties' honest assessments of conflicting Ninth Circuit authority.

Judge Boyle ultimately "concluded . . . that for [him, he did] not find *Sanchez-Gomez* as binding . . . ." (Ex. E at 25.) He gave three reasons for his decision: (1)

7

conflicting cases within the Ninth Circuit; (2) the Ninth Circuit's failure to adopt a rule "expressly requiring courts to follow published opinions prior to the issuance of the mandate" like the Eleventh Circuit; and (3) the language in mandates issued by this Court that the judgment "takes effect this date." (Ex. E at 25.) Nonetheless, Judge Boyle expressed his intent to continue "review[ing] the Pretrial Services' Report before every initial appearance and mak[ing] decisions on unshackling for those individuals who may be subject to unshackling," a practice that both parties had agreed was permitted under *Sanchez-Gomez* as long as they could also be heard in individual cases. (Ex. E at 22-23, 26. *See also* Pet. App. B at 5 ("And to be clear as well, just so you and your office know, I do intend to continue for initial appearances for myself to review each case individually before a detention hearing is conducted.").)

Notably, the FPD's office never sought to appeal Judge Boyle's ruling to the district court.

2.   <u>Magistrate Judge Duncan</u>:  On the same day as the hearings in Judge Boyle's courtroom, Judge Duncan issued two orders regarding *Sanchez-Gomez*. In the first, Judge Duncan stated that "[u]nless the U.S. Marshal or United States Attorney is prepared to show a particularized necessity for shackling, all defendants shall be brought into the Courtroom unshackled." (Ex. F.) Seemingly without argument from the FPD's Office or USAO, Judge Duncan later stayed that order

8

until further notice "in light of the Circuit's stay of *Sanchez-Gomez*." (Ex. G.) It is not clear how Judge Duncan has handled individual shackling requests in his courtroom following the entry of his amended order.

3.  Magistrate Judge Metcalf:  In Yuma, Magistrate Judge Metcalf intimated that he'd had a conversation with Chief Judge Collins in which his court was instructed to "continue to function as it ha[d] previously prior to the stay." (Pet. App. C at 9.) In a hearing a few weeks later, Judge Metcalf reiterated his "understanding . . . that . . . for the most part, within this district, presiding judges and the respective courts have been following what was the previous general position . . . which was to have full restraints in all detained defendant cases." (Repl. App. D at 5.)

4.  Magistrate Judge Burns:  On June 21 in Phoenix, Judge Burns conducted a combined change-of-plea/sentencing hearing in which a defendant requested unshackling. (RT 6/21/17 (Ex. H) at 2.) The AUSA at the hearing noted the mandate issue but also focused on the defendant's criminal history, which included an arrest for Resisting Arrest, Fleeing or Evading Police, in opposing the request. (Ex. H. at 2-3.) Judge Burns ultimately denied the unshackling request. Although she referenced the stay of the mandate when explaining her decision, it appears that she applied *Sanchez-Gomez* and based her denial on an individualized assessment of the defendant's characteristics, "taking into account everything that

9

the government has argued, as well as the charge here, as well as the fact that the defendant is being sentenced to 75 days of imprisonment . . . ." (Ex. H at 3-4.) The defendant did not seek clarification of the basis for Judge Burns's ruling.

5.    Magistrate Judge Willett: The same day, Magistrate Judge Willett, also in Phoenix, received an unshackling request for a defendant appearing for a combined change-of-plea/sentencing hearing. (Pet. App. A at 4.) Judge Willett asked for a response, and the AUSA argued that because the mandate hadn't issued, *Sanchez-Gomez* wasn't final. (Pet. App. A at 4.) Judge Willett noted that she had read the order staying issuance of the mandate, *Carver*, *United States v. Ruiz*, 935 F.2d 1033 (9th Cir. 1991), and *United States v. Foumai*, 910 F.2d 617, 620 (9th Cir. 1990), and quoted from portions of those opinions stating that "no expectation of finality can attach during the period in which either party may petition for rehearing" and "[r]eliance on the opinion would be a gamble." (Pet. App. A at 5.) She denied the request but allowed the FPD's office to make a record of one additional citation. (Pet. App. A at 6.)

6.    Other Magistrate Judges: The District of Arizona has 14 magistrate judges.  There is no evidence in the record regarding the conclusions of the remaining nine of those judges (Magistrate Judges Bade, Fine, Bowman, Ferraro, Kimmins, MacDonald, Markovich, Rateau, and Velasco) as to the effect of the stay of the mandate or how initial appearances are operating in their courtrooms.

7.   <u>District Judges</u>:  The District of Arizona has 11 district judges and an additional 10 senior district judges.[4]  Of those 21 judges, Petitioners have only provided evidence concerning two of their shackling approaches since the issuance of the June 16 order staying the mandate.

The first is Judge Jorgenson.  The record shows that the FPD's office in Tucson made an unshackling request partway through a sentencing hearing in Judge Jorgenson's courtroom. (Supp. App. at 5.) The USAO argued that because "the opinion hasn't been mandated yet," it was "really up to the discretion of the Court whether it's going to follow it or not." (Supp. App. at 6.) Judge Jorgenson asked the FPD attorney for the current status of the *Sanchez-Gomez* case and then denied the unshackling request, stating:

> We do have obviously – which I know you think it has to be individualized to a defendant, but we do have a policy in this district after consulting with the U.S. Marshal that shackling is the appropriate way to monitor defendants who are in custody, in court for various proceedings from the beginning to the end. So I know that that policy would violate *Sanchez-Gomez*. You can't have a universal policy applying to everybody. There has to be an individualized inquiry. And shackling, which I don't think is ever really defined in the *Sanchez-Gomez* decision, appears to mean everything from handcuffs on up. So in my discretion, I'm going to deny your request to either unshackle or partially unshackle your client.

---

[4] In Phoenix, there are six district judges (Campbell, Humetewa, Logan, Rayes, Snow, and Tuchi) and eight senior district judges (Bolton, Martone, McNamee, Rosenblatt, Silver, Strand, Teilborg, and Wake).  In Tucson, there are five district judges (Collins, Jorgenson, Marquez, Soto, and Zipps) and two senior district judges (Bury and Zapata).

(Supp. App. at 7.)

The second district judge whose approach is captured by the record is Judge Snow. In Phoenix, Judge Snow considered unshackling requests both before and after the *Sanchez-Gomez* mandate was stayed. On June 5, Judge Snow grappled with how *Sanchez-Gomez* would apply to a sentencing hearing given that it was based on the presumption of innocence, and indicated that the District was trying to determine how to handle the individualized assessments. (Repl. App. B at 5-6.) On June 19, Judge Snow indicated that he was aware the mandate had been stayed and suggested that "because we want to do this in an orderly way and haven't really considered it," he would "take advantage of the stay . . . ." (Repl. App. A at 3.) However, he also highlighted the contrast between the language in *Sanchez-Gomez* suggesting it applies to the sentencing phase and "the logic" of the decision, which would not seem to apply after a defendant has entered a guilty plea. (Repl. App. A at 3.) Judge Snow asked the FPD's office to "help [him] think that through . . . as we as a district figure out how we're going to respond intelligently and fairly to *Sanchez-Gomez*," because it was a concern of his and—he "suspect[ed]"—"several others of [his] colleagues." (Repl. App. A at 3-4.)[5]

---

[5] The recent activities of the shackling committee (whose genesis is discussed in footnote 2) provide further support for the conclusion that the District has not adopted a uniform policy. On June 2, Judge Tuchi contacted the members of the committee, stating that "Chief Judge Collins ha[d] asked the Committee to review its recommendations in light of the en banc opinion and if necessary to make new

## C.  **Injunction**

This Court issued an injunction against all 35 of Arizona's district and magistrate judges on July 14, 2017, ordering that the United States District Court for the District of Arizona comply with *Sanchez-Gomez*. (Dkt. 11.) The Court also ordered the government to respond to the mandamus petition within seven days. (Dkt. 11.)

## VI.  **STANDARD FOR RELIEF**

Mandamus is an "extraordinary remedy," justified only in "exceptional circumstances amounting to a judicial usurpation of power." *Will v. United States*, 389 U.S. 90, 95 (1967). To obtain a writ of mandamus, the petitioner must have no other adequate means to obtain the relief he desires, his right to the writ must be clear and indisputable, and the writ must be appropriate under the circumstances. *Cheney v. U.S. Dist. Ct. for D.C.*, 542 U.S. 367, 380-81 (2004). The party seeking mandamus bears the burden of showing that his "right to the issuance of the writ is 'clear and indisputable.'" *Will*, 389 U.S. at 95. This Court considers five factors:

> (1) The party seeking the writ has no other adequate means, such as a direct appeal, to attain the relief he or she desires.
> (2) The petitioner will be damaged or prejudiced in a way not correctable on appeal. . . .
> (3) The district court's order is clearly erroneous as a matter of law.

---

recommendations to the Court." (Ex. B.) The committee was still attempting to formulate a recommended policy when Judge Boyle conducted the June 20 hearing. *See* Ex. C ("To be clear, I do not speak for Judge Tuchi's committee or any other judge."). No new policy has been announced.

(4) The district court's order is an oft-repeated error, or manifests a persistent disregard of the federal rules.
(5) The district court's order raises new and important problems, or issues of law of first impression.

*Bauman v. U.S. Dist. Ct.*, 557 F.2d 650, 654-55 (9th Cir. 1977) (internal citations omitted). Of these factors, the third—that the district court's order is clearly erroneous as a matter of law—is a necessary precondition to the issuance of the writ. *In re Anonymous Online Speakers*, 661 F.3d 1168, 1174 (9th Cir. 2011).[6]

## VII. **ARGUMENT**

The mandamus petition represents massive overreaching and should be denied. There is no District-wide policy regarding either shackling or the effect of the stayed mandate in the wake of *Sanchez-Gomez*. Petitioners cannot show they have "no other adequate means . . . to attain the relief" they desire where they did not even request it from the majority of district judges. The relief they request is premature as to some judges and inappropriate as to others who are already applying *Sanchez-Gomez* in a manner not challenged by the FPD's Office.

Even more important, Petitioners cannot show that the few judges to whom they presented their arguments made decisions that were clearly erroneous as a matter of law or manifested a persistent disregard of the federal rules. These judges made a good-faith attempt to reconcile two conflicting strands of Ninth Circuit

---

[6] Petitioners agree that they must demonstrate "clear error" and that such a showing "is a necessary condition for granting . . . mandamus." (Pet. at 7-8, 10.)

authority and followed a position grounded in cases from this Circuit and others. Although Petitioners seek to rebuke all of the judges in the District for the decisions of a few, they cannot show that even those judges' decisions were indefensible or lacking any support in the case law.

**A.**     **Petitioners Cannot Satisfy the First _Bauman_ Factor.**

        1.     There is No "Routine Shackling Policy" in Effect in the District of Arizona

Petitioners seek a writ of mandamus against all 35 of Arizona's magistrate and district judges. To obtain such drastic relief, Petitioners must show these judges adhered to a District-wide policy of refusing to follow _Sanchez-Gomez. See Sanchez-Gomez_, 859 F.3d at 659, 666 (denying writ of mandamus because district's unconstitutional policy was no longer in effect, and discussing whether the lack of a policy terminated the "live controversy"); _Will_, 389 U.S. at 106 (describing the question of whether the district court's action "was the order in this particular case or some general practice adopted by [the district court] in this and other cases" as a "crucial issue" to mandamus review). And this Court would be "wise to adopt any fair reading" of the District's actions that enables it to "avoid wielding the mandamus club." _Bauman_, 557 F.2d at 660.

There is no uniform policy currently in effect in the District of Arizona on the issue of shackling. Petitioners recognize there was no such policy in effect immediately after _Sanchez-Gomez_ came out. (Pet. at 3.) They contend, however, that

there was a June 16 "direction" to all of the District's judges that caused "apparent uniformity" in refusing to comply with *Sanchez-Gomez* while the mandate was stayed. (Pet. at 3-4.)

This claim is inaccurate. Magistrate Judge Boyle conducted an extensive hearing on June 20 because he "had no direction from the court at large," and he then continued to make individualized shackling determinations in a manner the FPD's Office agreed was permitted under *Sanchez-Gomez*.[7] (Ex. E at 2, 22.) On the same day, Magistrate Judge Duncan issued an order regarding procedures in his courtroom and then amended it, and Petitioners have provided no evidence of the practice he is actually following.[8] (Ex. F; Ex. G.) Magistrate Judge Burns made an individualized assessment of a defendant's characteristics when denying an unshackling request. (Ex. H at 3-4.) And although Magistrate Judge Willett denied an unshackling request based on the stay of the mandate, she did so only after demonstrating that she had carefully read the Ninth Circuit cases on both sides of

---

[7] In their Reply in Support of the Emergency Motion for an Injunction, Petitioners suggest that Judge Boyle reversed course "the very next day" and summarily denied an unshackling request because the mandate had not yet issued. (Repl. at 6.) They neglect to mention that almost in the same breath, Judge Boyle reiterated his intent to "review each case individually before a detention hearing is conducted[,]" implying he had done so in that case. (Pet. App. B at 5.)

[8] They also have provided no evidence to support their speculation that Judge Duncan amended the order because his attention must have been drawn to the chief judge's "direction" after he issued the initial order. (Repl. at 7.)

16

the issue. (Pet. App. A at 5.) Meanwhile, on June 19, District Judge Snow indicated that the District was trying to figure out "how to respond intelligently and fairly to *Sanchez-Gomez*," wanting to do it "in an orderly way" and solicited suggestions from the FPD's Office. (Repl. App. A at 3.) District Judge Tuchi, too—at the Chief Judge's direction—was attempting to formulate a recommended policy for the District with the help of the FPD's Office and the USAO. (Ex. B.) Put simply, no District-wide policy came into being after the mandate was stayed.

Petitioners also would have this Court construe the *absence* of evidence concerning the practices of the other nine magistrate judges and 19 district judges in their favor. (Repl. at 8.) This Court should firmly reject this invitation. Petitioners' insinuations regarding evidence outside the record fail to meet their burden of demonstrating a policy against which a writ can issue. And their suggestion that they "ordered only a *representative sample* to attach to the petition and [the reply]" (Repl. at 8) (emphasis added) falls short when they failed to attach a transcript clearly stating that, as of June 20, at least one magistrate judge "had no direction from the court at large." (Ex. E at 2.)

Transcripts from District Judge Jorgensen (in Tucson) and Magistrate Judge Metcalf (in Yuma) mentioning the words "policy," "direction," and "general position" don't get Petitioners over the hurdle of the conflicting evidence. Although Judge Jorgensen used the words "we do have a policy," it is clear from the context

17

that she was discussing the policy that existed prior to *Sanchez-Gomez* (Supp. App. at 6-7), which Petitioners recognize judges stopped uniformly following immediately after *Sanchez-Gomez* was issued. (Pet. at 3.) Judge Metcalf's reference to a "direction" from Chief Judge Collins (Pet. App. C at 9), not particularly illuminating on its own, must also be read in context with Judge Boyle's comments that he had received "no direction," which refutes Petitioners' assertion that the chief judge's direction must have been "applicable to the court" at large rather than only Judge Metcalf's court. (Repl. at 4.) And Judge Metcalf's later statement that "for the most part . . . presiding judges and the respective courts have been following what was the previous general position" admittedly reflected only his "understanding" (Repl. App. D at 5), not the actual practices employed or rulings made, even if "the most part" could be equated with a District-wide policy (which it cannot).

Petitioners have made clear their dispute with the alleged direction is that it "did not mandate that judges *not* comply with *Sanchez-Gomez* – rather, it excused them from any belief that they *must* comply with *Sanchez-Gomez*." (Repl. at 5.) But even if a direction allowing independent judges to make reasoned and conscientious decisions resolving conflicting case law did exist, it is not a policy, and mandamus cannot lie against it. Just the opposite: it is what federal judges are duty-bound to do.

2. The Demand for Mandamus Relief is Premature and Overbroad

18

As noted, the judges of the District of Arizona have not adopted a uniform shackling policy following the stay of the mandate in *Sanchez-Gomez*. The evidence regarding the practices of seven individual judges is mixed, and Petitioners have made no showing that the remaining 28 magistrate and district judges intend to go one way or another. At best, issuance of a writ at this stage would be unacceptably premature. *See, e.g.*, *United States v. United States Dist. Ct. for S.D. Cal.*, 384 F.3d 1202, 1205 (9th Cir. 2004) ("Since we do not require district courts to imagine every conceivable challenge that a party could bring, we will not find the district court's decision so egregiously wrong as to constitute clear error where the purported error was never brought to its attention."); *Califano v. Moynahan*, 596 F.2d 1320, 1322 (6th Cir. 1979) ("We decline to employ the extraordinary remedy of mandamus to require a district judge to do that which he was never asked to do in a proper way in the first place.").

Alternatively, issuing a writ against the entire District Court would cut too broadly. There were magistrate judges—even before the injunction was issued—who were handling unshackling requests in a manner the FPD's Office agreed was permissible under *Sanchez-Gomez*. (Ex. E at 22-33.) "Wielding the mandamus club" in such a circumstance swings too widely. Petitioners cannot show a "clear and indisputable" right to the issuance of the writ against judges who are already doing what the writ would ask them to do.

19

3.   Petitioners Had Available Many Other Adequate Means to Attain the Relief They Desired

Petitioners argue that because they requested unshackling and made a record on their position on the mandate before a few magistrate and district judges, they had no adequate means to obtain relief except mandamus. (Pet. at 8.) The evidence before this Court demonstrates that claim is untrue.

First, Petitioners failed to ever seek review of any magistrate judge's ruling— in either an individual case or regarding the effect of the stay of the mandate—in the district court. The magistrate judges to whom they presented argument listened, asked questions, read cases, and sincerely tried to resolve the conflicts in this Court's case law. Petitioners never requested district court review of those rulings, and the district judges to whom they made individual shackling arguments had not prejudged the issue. (Repl. App. B at 5-6; Repl. App. A at 3-4) (showing that Judge Snow candidly told the FPD's Office that the District was trying to determine how to handle individualized assessments and later solicited their input in the process). This is a far cry from "incorporat[ing] by reference previous justifications in a general fashion" or "refus[ing] to allow defendants to make objections or create evidentiary records." *Sanchez-Gomez*. 859 F.3d at 661 n.9.

Second, *Sanchez-Gomez* itself illustrates the existence of possible remedies that Petitioners neglected to pursue here. The *Sanchez-Gomez* defendants, in addition to appealing the denials of their unshackling requests to the district court,

filed "emergency motions" challenging the constitutionality of the shackling policy in the district court, and only appealed when those motions were denied. *Id*. at 654. Petitioners here skipped all of these possible avenues for relief before district judges who—based on the limited transcripts available—were open-minded on the topic. A writ of mandamus cannot ratify Petitioners' behavior here. Petitioners should have asked for relief in the district court.

## B.  Petitioners Cannot Satisfy the Third *Bauman* Factor

As noted, the third factor governing a request for mandamus relief is whether "the district court court's order is clearly erroneous as a matter of law." *Bauman*, 557 F.2d at 654-55. This is the most important of the *Bauman* factors—absent a showing of clear error, a mandamus petition must be denied. *Burlington Northern & Santa Fe Ry. Co. v. U.S. Dist. Ct. for Dist. Of Mont.*, 408 F.3d 1142, 1146 (9th Cir. 2005) ("The absence of the third factor, clear error, is dispositive.").

The Supreme Court has exhorted Circuit judges to rigorously enforce the clear-error requirement. As the Court has explained, because "mandamus against a lower court . . . is a drastic and extraordinary remedy reserved for really extraordinary causes . . . only exceptional circumstances amounting to a judicial usurpation of power or a clear abuse of discretion will justify the invocation of this extraordinary remedy." *Cheney*, 542 U.S. at 380 (citations and internal quotation marks omitted).

21

For these reasons, it's not enough for a party seeking mandamus to argue the underlying court was wrong—instead, the petitioner must go further and demonstrate the lower court's analysis was indefensible and lacking any support in the case law. For example, in *In re Van Dusen*, 654 F.3d 838, 845-46 (9th Cir. 2011), even though this Court concluded that "we favor Petitioners' interpretation over that of the District Court," it denied mandamus relief because the disputed issue was "relatively close" and because "certain language appearing in the relevant doctrine could be interpreted to lend support to the District Court's position." Similarly, in *United States v. Mehrmanesh*, 652 F.3d 766, 770-71 (9th Cir. 1981), this Court held that because "[t]he question decided below was a close one . . . [w]hether or not the district court's interpretation is ultimately upheld on appeal after final judgment, we cannot now find it to be 'clearly erroneous as a matter of law as that term is used in mandamus analysis.'" And again, in *Bauman*, this Court concluded that, "given the split in authority on this issue, the error would be anything but the required clear error." 557 F.2d at 661-62.[9]

This backdrop is crucial in evaluating the purported error in this case. Put simply, this Court's case law is difficult to reconcile on the issue whether an opinion

---

[9] *See also DeGeorge v. U.S. Dist. Ct. for C.D. Cal.*, 219 F.3d 930, 936 (9th Cir. 2000) ("If . . . the question is a close one . . . we cannot hold the district court's interpretation to be clearly erroneous, and thus we cannot issue the writ, even though the district court's interpretation might be overruled later on direct appeal.").

becomes binding Circuit law immediately upon issuance or whether it becomes binding only after the mandate has issued. Furthermore, there is a split in authority in other Circuits on this issue. Thus, even if this Court were to disagree with the determination in this case (made by a handful of magistrate judges and never litigated at the district-court level) that opinions only become binding law after the mandate has issued, that determination was not so obviously and flagrantly wrong as to trigger the drastic remedy of mandamus relief against the entire roster of Arizona's 35 federal judges.[10]

Indeed, several decisions of this Court support the view that opinions don't become Circuit law until the mandate has issued. In *Ruiz*, 935 F.2d at 1037, this Court explained that the "legitimacy of an expectation of finality of an appellate order depends on the issuance or not of the mandate," that a decision is "not yet fixed as settled Ninth Circuit law" until the mandate issues, and that it is a "gamble" to rely upon such a decision. In *Carver*, 558 F.3d at 878-79, this Court held that the legal analysis contained in a published opinion is "not yet enshrined as a binding construction of the Constitution" until the mandate issues. And in *Nat'l Resources Def. Council, Inc. v. County of Los Angeles*, 725 F.3d 1194, 1203-04 (9th Cir. 2013),

---

[10] For this reason, too, Petitioners fail to meet the fourth *Bauman* factor: the judges here displayed the opposite of a "persistent disregard of the federal rules," and Petitioners have not even given them the opportunity to make any error "oft-repeated."

this Court reiterated that "[n]o opinion of this circuit becomes final until the mandate issues'" and held that because "[t]he mandate in this case has not issued . . . our earlier judgment is not final."

Other authorities provide further support for the view that, during the period after an appellate opinion has been published but before the mandate has issued, the opinion exists in a non-final, provisional form. For example, the 1998 advisory committee note to Rule 41(c) of the Federal Rules of Appellate Procedure explains that "[a] court of appeals' judgment or order is not final until issuance of the mandate; at that time the parties' obligations become fixed." Similarly, the mandates issued by this Court typically include the following statement: "The judgment of this Court entered [on X date] takes effect this date." This language, of course, raises the inference that the opinion had not yet "taken effect" before the mandate issued. Finally, courts in several other Circuits have expressly held that an appellate opinion does not bind all of the district courts within a Circuit until the mandate has issued. *See, e.g., Bradford v. HSBC Mortgage Corp.*, 2012 WL 12875878, *1 (E.D. Va. 2012) ("[T]he panel decision in *Gilbert* cannot yet be considered binding here because the Fourth Circuit's formal mandate has not yet issued in that case. Indeed, the Fourth Circuit has stayed its mandate in *Gilbert* in light of appellees' timely filed petition for rehearing and for rehearing en banc . . . [and] decisions of the court of appeals become binding on a district court only after the issuance of the appellate

24

court's mandate . . . ."); *United States v. Swan*, 327 F. Supp. 2d 1068, 1071-72 (D. Neb. 2004) ("[T]he court finds it is not bound to follow *Mooney* at this time, since the appeals court decision is not yet final. . . . 'A Court of Appeals' judgment or order is not final until issuance of the mandate, at that time the parties' obligation becomes fixed' . . . .  Accordingly, until the mandate in *Mooney* issues, this court is not obliged to follow the dictates of the *Mooney* decision.").

On the other hand, it's also true that several of this Court's decisions from the 1980s and 1990s hold that an opinion becomes binding immediately upon publication. *See, e.g., Gomez-Lopez*, 62 F.3d at 306 ("The government first urges us to ignore *Armstrong* since we have stayed the mandate to allow filing of a petition for certiorari; this we will not do, as *Armstrong* is the law of this circuit."); *Chambers*, 22 F.3d at 942 n.3 ("We reject the government's argument that *X–Citement Video* is not binding precedent until the mandate issues in that case."); *Wedbush, Noble, Cooke, Inc. v. SEC*, 714 F.2d 923 (9th Cir. 1983) (same). These opinions are, admittedly, difficult to reconcile with *Ruiz, Carver, NRDC*, the 1998 advisory committee note to Rule 41(c), and the other authorities discussed above. Nevertheless, the key point for mandamus purposes is that the handful of Arizona magistrate judges who addressed the mandate issue were aware of these contradictory lines of authority and did their best to reconcile them, ultimately choosing to follow the more recently-decided cases. This is not the type of

circumstance where mandamus relief is warranted. *Cf. Van Dusen*, 654 F.3d at 845-46 (denying mandamus petition because "certain language appearing in the relevant doctrine could be interpreted to lend support to the District Court's position").

Petitioners contend the magistrate judges were wrong to rely on the *Ruiz/Carver/NRDC* line of cases because "[i]n relying on those opinions, [the judges] appear[] to have overlooked the important distinction between the doctrine of the law of the *case*, and the doctrine of the law of the *circuit*." (Pet. at 12-16.) This argument is unavailing. In *Ruiz, Carver,* and *NRDC,* this Court offered broad and unqualified statements about the provisional status of opinions during the period before the mandate has issued—it announced in *Ruiz* that such opinions are "not yet fixed as settled Ninth Circuit law," reaffirmed in *Carver* that the analysis in such opinions is "not yet enshrined as a binding construction of the Constitution," and commented in *NRDC* that such opinions are "not final." In making those pronouncements, this Court never suggested it was only describing the status of such opinions in relation to the law-of-the-case doctrine but not with respect to the law-of-the-Circuit doctrine. Indeed, the only place where this purported distinction appears is Petitioners' brief—it never has been recognized by any court.[11] The

---

[11] *Gonzalez v. Arizona*, 677 F.3d 383, 389 n.4 (9th Cir. 2012), does not, as Petitioners contend, recognize that unmandated opinions are final for law-of-the-Circuit purposes but not for law-of-the-case purposes. Indeed, footnote four of *Gonzalez* says nothing at all about the key issue presented here: whether the issuance of the mandate has significance in assessing when an opinion becomes law of the Circuit.

bottom line is that the *Ruiz/Carver/NRDC* line of cases can't be distinguished from the *Gomez-Lopez/Chambers/Wedbush* line of cases in the blithe manner suggested by Petitioners. Intra-circuit splits of authority do arise from time to time[12] and this appears to be one of those instances.

Alternatively, even if it were possible to tease out a distinction between the law-of-the-case and law-of-the-Circuit doctrines, this still would not entitle Petitioners to mandamus relief. As noted, mandamus is a drastic remedy that should be reserved for palpable cases of clear error. It should not be imposed against 35 federal judges based on a handful of magistrate judges' failure to ascertain some unarticulated distinction in the case law that's never been recognized by other courts.

Next, Petitioners criticize the judges' reliance on the 1998 advisory committee note to Rule 41(c). (Pet. at 17-18.) As noted, this provision states: "A court of appeals' judgment or order is not final until issuance of the mandate; at that time the parties' obligations become fixed." In Petitioners' view, this provision shouldn't be interpreted as proof that appellate decisions remain "not final" for all purposes until the mandate issues. Instead, they argue the second part of the provision acts as a "crucial qualifier" and is meant to connote that appellate decisions only remain "not final" as to the parties in the underlying case (while serving as "final" decisions to

---

[12] *See, e.g., United States v. Gasca-Ruiz*, 852 F.3d 1167, 1168 (9th Cir. 2017) ("We took this case *en banc* to resolve an intra-circuit conflict over the standard of review that applies . . . .").

all other litigants throughout the Circuit) during the post-issuance, pre-mandate period.

This argument, again, misses the mark. The first and second clauses of the advisory committee note are separated by a semicolon. It would defy the rules of statutory construction to conclude that the second clause was nevertheless intended to dramatically qualify the first. *McLeod v. Nagle*, 48 F.2d 189, 191 (9th Cir. 1931) ("[S]ince the semicolon has been used to set off the various subdivisions of the section, the initial phrase . . . cannot be presumed to carry over into the subsequent clauses that are separated from the initial clause by a semicolon. . . . The semicolon effectually isolates the opening clause and its dependent phrase from the other and subsequent clauses."). *Cf. United States v. Hayes*, 555 U.S. 415, 422 (2009) ("Had Congress placed the . . . phrase in its own clause, set off from [the other] clause . . . by a semicolon or a line break, the lawmakers might have better conveyed [the absence of modification]."). Furthermore, this Court has expressly recognized that appellate opinions are "not final" until the mandate issues—the very interpretation of Rule 41(c) that Petitioners seek to dispute here. *NRDC*, 725 F.3d at 1203-04 ("No opinion of this circuit becomes final until the mandate issues.").

Petitioners' next claim is that their position must be correct because, otherwise, there would be no reason for this Court to declare, after agreeing to hear a particular case *en banc*, that the underlying three-judge panel decision "shall not

28

be cited as precedent." (Pet. at 18.) This argument is easily rejected. Granting rehearing *en banc* is the functional equivalent of hitting the reset button on a particular case—the original three-judge panel's opinion becomes a nullity and a new group of judges (11 rather than three) is assigned to consider the matter anew and issue a new decision. For these reasons, it's necessary to caution litigants not to rely upon the original three-judge panel's decision even though it will remain in the pages of the Federal Reporter—it will be superseded by a new opinion and has effectively ceased to exist.

Finally, Petitioners invoke a parade of horribles, arguing that the rejection of their position (1) would require courts, and the editors of the Bluebook, to adopt a new form of citation to signal an opinion's lack of precedential force while the mandate has been stayed and (2) would cause general disarray among litigants and judges. (Pet. at 18-20.) These arguments are, once again, unavailing. As noted, courts in the Fourth and Eighth Circuits have long applied the rule that a published decision does not become Circuit law until the mandate issues (see *Bradford*, 2012 WL 12875878 at *1; *Swan*, 327 F. Supp. 2d at 1071-72), yet those Circuits have managed to avoid the havoc and calamity that Petitioners seek to conjure here.

29

## VIII.  <u>CONCLUSION</u>

For the foregoing reasons, the petition for a writ of mandamus should be dismissed or denied. Furthermore, because the Court's issuance of injunctive relief on July 14 was predicated on an expectation that Petitioners would prevail in this mandamus action, the Court also should vacate the injunction.

ELIZABETH A. STRANGE
Acting United States Attorney
District of Arizona

*s/ Krissa M. Lanham*
DOMINIC W. LANZA
KRISSA M. LANHAM
Assistant United States Attorneys

## IX.  <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 21st day of July, 2017, I electronically filed the Response to Petition for Writ of Mandamus with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system.  Participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system.


*s/ Krissa M. Lanham*
KRISSA M. LANHAM
Assistant U.S. Attorney

31